J. S51032/18

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

IN THE INTEREST OF:  Y.A., A MINOR  :   IN THE SUPERIOR COURT OF
                                                     :        PENNSYLVANIA
                                                     :
APPEAL OF:  S.A., FATHER              :        No. 1059 EDA 2018


Appeal from the Decree Dated March 9, 2018,
in the Court of Common Pleas of Philadelphia County
Family Court Division at Nos. CP-51-AP-0000026-2018,
CP-51-DP-1000034-2016


BEFORE:  DUBOW, J., NICHOLS, J., AND FORD ELLIOTT, P.J.E.


MEMORANDUM BY FORD ELLIOTT, P.J.E.:        **FILED SEPTEMBER 07, 2018**

S.A. ("Father") appeals from the March 9, 2018 decree entered in the

Court of Common Pleas of Philadelphia County, Family Court Division,

involuntarily terminating his parental rights to his dependent child, Y.A.,

male child, born in March of 2014 ("Child"), pursuant to the Adoption Act,

23 Pa.C.S.A. §§ 2511(a)(2) and (b).  After careful review, we affirm.

The trial court set forth the following:

> [Child] and his family have been known to the City of
> Philadelphia Department of Human Services (DHS)
> since June 5, 2015, when DHS received a General
> Protective Services (GPS) report, which alleged that
> [Child], and his Mother, had been residing in the
> Salvation Army shelter, since March 26, 2015 due to
> domestic violence between Mother and Father and
> that Mother was nine months pregnant.  The report
> further alleged that Mother had admitted to shelter
> staff that she had been abusing Percocet, taking up
> to ten pills per day.  The report also alleged that
> Mother and [Child] had poor hygiene and that
> Mother seemed overwhelmed, as she frequently

overslept and struggled to appropriately care for [Child] and maintain her room. The report alleged that [Child] scored low in fine motor skills and personal/social skills on the Ages and Stages assessment. This report was determined to be valid.

On June 17, 2015, DHS received an additional GPS report, which alleged that Mother tested positive for opiates and Oxycodone at the time of the delivery of [Child's] sibling [Y.], and that he [sic] testified positive for methadone. The report further alleged that Mother admitted abusing Percocet and that Mother was denied in-patient drug and alcohol treatment at Gaudenzia as she continued to actively abuse drugs. It was reported that Mother had been enrolled in Thomas Jefferson University Hospital's methadone maintenance program, but failed to attend drug and alcohol treatment as scheduled. The report further alleged that Mother failed to attend numerous prenatal appointments. It was reported that [Child's] sibling born at 39 weeks gestation, weighed five pounds and 15 ounces, and had APGAR scores of 2/4/6. The report further alleged that Mother was residing in a shelter due to domestic violence concerns, that Mother was unemployed, that Mother has a history of abusing various opiates including Oxycodone, Suboxone and Percocet, as well as marijuana. It was also alleged that Mother was not prepared for [Child's] sibling's birth as she lacked a crib, diapers, and formula. The report [was] determined to be valid.

In the course of DHS investigation of the June 17, 2015 GPS report, Mother admitted to substance abuse issues and agreed to attend a long-term residential substance abuse treatment through My Sister's Place.

On July 24, 2015, DHS implemented In-Home Safety Services for [Child], [Child's] sibling, and Mother, in their residence [at] My Sister's Place, through Bethanna's [C]ommunity Umbrella Agency.

On October 29, 2015, Bethanna learned that Mother had taken the children and left My Sister's Place against medical advice and without completing the program, on or around October 20, 2015.

The whereabouts of Mother and the children remained unknown to Bethanna and DHS until November 14, 2015.

On November 14, 2015, DHS learned that [Child's] sibling died while co-sleeping with Mother [] the residence of [Child's] Grandmother.

On or around November 18, 2015, Mother and DHS agreed that [Child] would reside with his Paternal Grandmother pursuant to a safety plan and family arrangement.

On May 9, 2016, DHS received a GPS report, which alleged that Mother continued to engage in polysubstance abuse, despite attending outpatient treatment at Thomas Jefferson University Hospital Family Center. It was reported Father was incarcerated. The report was determined to be valid.

On May 9, 2016, DHS obtained an Order of Protective Custody (OPC) for [Child] and placed him in a foster home through Delta Community Supports, Inc.

At the May 11, 2016, Shelter Care Hearing, this Honorable Court lifted the OPC, ordered temporary commitment of [Child] to DHS to stand.

At the Adjudicatory Hearing held on May 19, 2016, this Honorable Court determined that [Child] was a dependent child, based on parent's inability to provide him with proper parental care and control, committed [Child] to DHS care and custody. The Court further ordered that a Single Case Plan meeting to be held with in [sic] 20 days with objectives to be made for Father; the Court ordered CUA was to make outreach to Father and to identify a new foster home for [Child]. The Court also

ordered that when [Child] was moved the whereabouts of the foster home were not to be disclosed to Mother. Maternal and Paternal Grandmothers were ruled out as possible resources for [Child's] care.

On July 12, 2016, a Single Case plan meeting was held. Father's parental objectives were to make his whereabouts known to CUA case manager and maintain contact to establish service needs and discuss the process of the case.

At the October 4, 2016 Permanency Review Hearing held for [Child], Judicial Officer Alexis Cicone ordered [Child] to remain committed to DHS. Father remained incarcerated and was found to be non-compliance [sic] with his parental objectives.

At the Permanency Review Hearing held on January 5, 2017, the Court found that foster placement for [Child] continued to be necessary and appropriate. Father remained in state custody, housed at SCI Somerset. The Court ordered CUA to continue to outreach to Father and address his objectives.

On June 16, 2017, a Permanency Review Hearing was held for [Child] before Honorable Lyris Younge, who found that foster placement continued to be necessary and appropriate. At the time of the hearing, Father remained incarcerated in state custody and had not been involved in [Child's] daily care or prepared to meet [Child's] daily needs.

The matter was listed on a regular basis before judges of the Philadelphia Court of Common Pleas, Family Court Division-Juvenile Branch pursuant to section 6351 of the Juvenile Act, 42 Pa.C.S.A. § 6351, and evaluated for the purpose of reviewing the permanency plan of the [C]hild.

In subsequent hearings, the Dependency Review Orders reflect the Court's review and disposition as a

> result of evidence presented, primarily with the goal of finalizing the permanency plan.
>
> On March 9, 2018, during the Termination of Parental Rights Hearing for Father, the Court found by clear and convincing evidence that Father's parental rights, should be terminated pursuant to the Juvenile Act  Furthermore, the Court held it was in the best interest of the [C]hild that the goal be changed to Adoption.

Trial court opinion, 5/9/18 at 1-3.

The record reflects that Father filed a timely notice of appeal and a statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). The trial court then filed its Rule 1925(a) opinion.

Father raises the following issues for our review:

> 1. Did the court err in changing the goal to adoption and terminating [Father's] parental rights under 23 Pa. C.S. § 2511(a)(2) because [DHS] failed to establish by clear and convincing evidence that the conditions and causes of [Child's] incapacity, abuse, neglect or refusal cannot or will not be remedied by [Father?]
>
> 2. Did the court err in changing the goal to adoption and terminating [Father's] parental rights under 23 Pa.C.S. § 2511(b) because the lower court failed to give primary consideration to the development, physical and emotional needs and welfare of the [C]hild insofar as [Child] is bonded to his [F]ather[?]

Father's brief at 3.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, 9 A.3d [1179, 1190 (Pa. 2010)].

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is guided by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially,

the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*), quoting *Matter of Adoption of Charles E.D.M. II*, 708 A.2d 88, 91 (Pa. 1998).

In this case, the trial court terminated Father's parental rights pursuant to Section 2511(a)(2), as well as Subsection (b). Subsections 2511(a)(2) and (b) provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential

> parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that

- 8 -

cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015), quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. . . . [A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *In re A.L.D.*, 797 A.2d at 340 (internal quotation marks and citations omitted).

With respect to incarcerated parents, in *In re Adoption of S.P.*, our supreme court held as follows:

> [W]e now definitively hold that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S.A. § 2511(a)(2). *See e.g. Adoption of J.J.*, 511 Pa. 590, 515 A.2d 883, 891 (Pa. 1986) ("[A] parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties."); [*In re:*] *E.A.P.*, [944 A.2d 79, 85 (Pa.Super. 2008)] (holding termination under § 2511(a)(2) supported by mother's repeated incarcerations and failure to be present for child, which caused child to be without essential care and subsistence for most of her life and which cannot be

remedied despite mother's compliance with various prison programs). If a court finds grounds for termination under subsection (a)(2), a court must determine whether termination is in the best interests of the child, considering the developmental, physical, and emotional needs and welfare of the child pursuant to § 2511(b). In this regard, trial courts must carefully review the individual circumstances for every child to determine, **_inter alia_**, how a parent's incarceration will factor into an assessment of the child's best interest.

**_In re Adoption of S.P._**, 47 A.3d at 830-831.

Here, the trial court terminated Father's parental rights pursuant to Section 2511(a)(2) finding that:

the Court has taken testimony by [F]ather and by Ms. Ferguson,[1] and actually, I find both to be credible.

But the reality of it is, this [C]hild came into care at or around May 2016, and as we sit here, we are close to 22 months in which the [C]hild has been in care, [and Child] will be four in a week.

So, the majority of his life, he has been outside of – environment where there will be parental care and control. And I submit to you that unfortunately, [Father] is incarcerated, and it's limited in what he can do to ensure the [C]hild's safety, to provide a nurturing environment for him.

. . . .

I do believe that the Department has met their burden of proof, pursuant to 2511(a)(2) in terms of the incapacity of [Father]. . . .

_____

[1] The record reflects that Ms. Ferguson is Dawn Ferguson, the Bethanna CUA social worker who was assigned to Child's case in October 2017. (Notes of testimony, 3/9/18 at 2, 23.)

Notes of testimony, 3/9/18 at 59-60.

In its Rule 1925(a) opinion, the trial court further explained that its "decision was reflective of testimony of Father's incarceration and a lack of ability to provide a safe and nurturing environment for [Child.]" (Trial court opinion, 5/9/18 at 5.) Indeed, as noted by the trial court and as reflected in the record, "Father testified he was arrested on January 29, 2015 and was currently serving [a] five to ten year prison sentence for the crime of attempted delivery of [a] controlled substance. Father testified the minimum date of his release from incarceration was January 2020." (*Id.* at 4 (citations to notes of testimony omitted).)

We conclude that the record supports the trial court's factual findings and that the trial court did not abuse its discretion in terminating Father's parental rights under Section 2511(a)(2) because Father's incarceration rendered him incapable of providing "essential parental care, control or subsistence" and the length of the Father's remaining confinement prohibit Father from remedying the conditions and causes of his incapacity to parent.

We now turn to whether termination was proper under Section 2511(b). As to that section, our supreme court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles

- 11 -

such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012). In *In re E.M.*, 620 A.2d [481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d at 1121 (internal citations omitted).

Moreover,

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the

> child might have with the foster parent.
>
> . . .

*In re Adoption of C.D.R.*, 111 A.3d at 1219, quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011) (quotation marks and citations omitted).

Our supreme court has stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, 73 A.3d at 268. The court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* court observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

In determining that termination of Father's parental rights favored Child's needs and welfare pursuant to Section 2511(b), the trial court noted that "the reality of it is that this [C]hild has spent more time in the foster home that's pre-adoptive than he has with his biological parents." (Notes of testimony, 3/9/18 at 60.) As further explained by the trial court in its Rule 1925(a) opinion and as supported by the record, Ms. Ferguson testified that Child's foster parents provide for his care and day-to-day needs, that Child's relationship with his foster parents is educational for Child, that Child looks to his foster parents as his caregivers, that Child refers to both of his foster parents as "mom," that there would be no harm to Child if Father's

parental rights were terminated and Child was freed for adoption, and that it would be in Child's best interest to terminate Father's parental rights and free Child for adoption. (Trial court opinion, 5/9/18 at 5; *see also* notes of testimony, 3/9/18 at 27-30.) Our review of the record supports this determination, and the trial court did not abuse its discretion in terminating Father's parental rights.

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Father's parental rights under Sections 2511(a)(2) and (b).

Decree affirmed.

Nichols, J. joins this Memorandum.

Dubow, J. did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/7/18